DOUGLAS B. GRANT v. EMMCO INSURANCE COMPANY

No. 85

(Filed 8 May 1978)

1. **Insurance § 6.1— construction of policy—meaning of words**

    In the construction of an insurance policy, nontechnical words not defined in the policy are to be given the same meaning they usually receive in ordinary speech, unless the context requires otherwise.

2. **Insurance § 6.2— construction of policy—liberal construction in favor of insured—limitation**

    Where there is no ambiguity in the language used in an insurance policy, the courts must enforce the contract as the parties have made it and may not impose liability upon the company which it did not assume and for which the policyholder did not pay; however, a contract of insurance should be given that construction which a reasonable person in the position of the insured would have understood it to mean and, if the language used in the policy is reasonably susceptible of different constructions, it must be given the construction most favorable to the insured, since the company prepared the policy and chose the language.

3. **Insurance § 72— collision insurance—leased vehicle—newly acquired vehicle covered under policy**

    An International tractor leased by plaintiff was covered by a collision insurance policy on a Ford tractor owned by plaintiff where the policy provided coverage not only for the designated vehicle owned by the insured but also for a vehicle not so designated if "such vehicle is newly acquired by the named insured during the policy period," and if "it replaces a described covered vehicle, or as of the date of its delivery this insurance applies to all covered automobiles," and if "the named insured notifies the company within 30 days following such delivery date," since such ambiguous language must be construed in favor of insured; when so construed, a "newly acquired" vehicle is a "covered automobile," even though it does not replace a "described covered vehicle"; and the International tractor was an "acquired" motor vehicle within the meaning of the policy and, consequently, a "newly acquired" one, since plaintiff, by his agreement with lessor, acquired the legal, nonterminable right to use the vehicle as if he were its absolute owner for the specified period and the policy did not exclude leased vehicles.

4. **Insurance § 72— collision insurance—replacement vehicle—no distinction between temporary and permanent replacement**

    Where a collision insurance policy made no distinction between a vehicle acquired as a permanent replacement and one acquired as a temporary replacement, the policyholder was entitled to give the word "replaces" its common and ordinary meaning and to assume that a vehicle leased for a specified period while the vehicle designated in the policy was being repaired replaced such vehicle.

**5. Insurance § 72— collision insurance—newly acquired automobile—replacement vehicle—operability of designated vehicle**

　　A "newly acquired" automobile does not "replace" the vehicle designated in the policy if the designated automobile continues to be owned by the policyholder, under his control and in operable condition.

**6. Insurance § 72— collision insurance—replacement vehicle—sufficiency of complaint**

　　Plaintiff's complaint was sufficient to show that a leased International tractor was a "replacement" vehicle within the purview of a collision insurance policy covering a Ford tractor owned by plaintiff and newly acquired vehicles "replacing" the covered vehicle where it appeared that at all times from the acquisition, by lease, of the International tractor, the Ford tractor was undergoing repairs and was not in operable condition.

APPEAL by the plaintiff from the decision of the Court of Appeals affirming the judgment of *Gavin, J.*, at the January 1977 Civil Session of HARNETT dismissing the action for failure of the complaint to state a claim upon which relief can be granted, Judge Webb dissenting.

The complaint, summarized, alleges:

The defendant issued to the plaintiff, on or about 2 April 1975, a policy of insurance, attached as an exhibit to the complaint, insuring the plaintiff against damage by collision to "a 1973 Ford tractor owned by the plaintiff and any substitute vehicle," the policy containing a definition of the term "covered automobile." On or about 9 June 1975, while the plaintiff was operating his 1973 Ford tractor, a malfunction therein occurred. As a result of such malfunction, the plaintiff leased a 1974 International tractor for the purpose of providing the plaintiff with a "substitute vehicle," a copy of the lease contract being attached to the complaint as an exhibit. The plaintiff did not procure additional insurance against collision damage to the leased vehicle, being of the opinion that such damage was covered by the above mentioned policy. On or about 16 June 1975, which was during the period of the lease and during the life of the above mentioned policy, the leased tractor was severely damaged by a collision. By the terms of the lease contract, the plaintiff is liable to the lessor for the damage to the leased vehicle. He has demanded payment of such damage from the defendant and the defendant has refused to pay the same.

The lease agreement, so made part of the complaint, leased the International tractor to the plaintiff for a period of 21 days, this apparently being the period which the plaintiff anticipated would be sufficient for the repair of the Ford tractor specifically designated in the insurance policy. The lease agreement, which was upon a printed form, bore upon its face a handwritten entry "(*replacing Ford*)." It contained an undertaking by the lessee to return the leased vehicle to the lessor "in the same condition," ordinary wear and tear excepted, and also excepting certain specified risks of loss, such as fire, theft and other "comprehensive type damages." The lease agreement expressly provided that the lessee would be liable for all collision damage up to $25,000. Thus, as the body of the complaint alleges, the plaintiff became liable to the lessor of the International tractor for the damage it sustained in the said collision.

The policy of insurance, on its first page, provided that as of its effective date, "As to covered automobiles (including newly acquired vehicles, subject to the provisions of paragraph (b) of the 'covered automobile' definition) * * * the insurance afforded is only with respect to such of the following coverages, and under each such coverage to such covered automobiles described in the Schedule of Covered Automobiles, as are indicated by specific premium charge or charges." The "COVERAGES" on this page showed coverage against collision, fire, lightning, theft and "Combined Additional" risks and described the insured vehicle as a "1973 Ford tractor X90TVR52259."

The second page of the policy contained the company's agreement to pay for loss to "covered automobiles" by collision or by the other above mentioned risks. This page of the policy states, "Such insurance as is afforded under each coverage applies separately to each covered automobile." A definition section of the policy then provides:

" 'Covered automobile' means a land motor vehicle * * * which is either

(a) designated in the declarations, by description, as a covered automobile to which this insurance applies and is owned by the named insured; *or*

(b) if not so designated, such vehicle is newly acquired by the named insured during the policy period provided, however, that:

    (i) it replaces a described COVERED AUTOMOBILE *or* as of the date of its delivery this insurance applies to all covered automobiles, *and*

    (ii) the named insured notifies the company within 30 days following such delivery date; * * *" (Emphasis added.)

*Morgan, Bryan, Jones, Johnson, Hunter & Greene by K. Edward Greene for Plaintiff.*

*McLean, Stacy, Henry & McLean by Everett L. Henry for Defendant.*

LAKE, Justice.

A motion to dismiss for failure of the complaint to state a claim upon which relief can be granted is the equivalent of a demurrer under the old practice for failure of the complaint to state a cause of action. *Sutton v. Duke*, 277 N.C. 94, 176 S.E. 2d 161 (1970). Consequently, in passing upon such a motion, the allegations of the complaint are deemed to be true and the motion should not be allowed unless the complaint affirmatively shows that the plaintiff has no cause of action. *Smith v. Ford Motor Co.*, 289 N.C. 71, 83, 221 S.E. 2d 282 (1976); *Consumers Power v. Power Co.*, 285 N.C. 434, 439, 206 S.E. 2d 178 (1974); *Forrester v. Garrett, Comr. of Motor Vehicles*, 280 N.C. 117, 184 S.E. 2d 858 (1971); *Sutton v. Duke, supra.* We turn, therefore, to the question of whether the Court of Appeals was correct in its conclusion that it clearly appears upon the face of the complaint, including the policy of insurance and the lease agreement incorporated therein, that no facts which could be proved, pursuant to these allegations, would entitle the plaintiff to any relief in this action.

[1, 2] It is firmly established law that, in the construction of an insurance policy, nontechnical words, not defined in the policy, are to be given the same meaning they usually receive in ordinary speech, unless the context requires otherwise. *Trust Co. v. Insurance Co.*, 276 N.C. 348, 354, 172 S.E. 2d 518 (1970); *Insurance Co. v. Shaffer*, 250 N.C. 45, 108 S.E. 2d 49 (1959); *Powers v. In-*

*surance Co.*, 186 N.C. 336, 119 S.E. 481 (1923); 11 Couch on Insurance 2d, § 42:191 (1963). Where there is no ambiguity in the language used in the policy, the courts must enforce the contract as the parties have made it and may not impose liability upon the company which it did not assume and for which the policyholder did not pay. *Trust Co. v. Insurance Co., supra; Williams v. Insurance Co.*, 269 N.C. 235, 152 S.E. 2d 102 (1967); *Motor Co. v. Insurance Co.*, 233 N.C. 251, 63 S.E. 2d 538 (1951). However, a contract of insurance should be given that construction which a reasonable person in the position of the insured would have understood it to mean and, if the language used in the policy is reasonably susceptible of different constructions, it must be given the construction most favorable to the insured, since the company prepared the policy and chose the language. *Trust Co. v. Insurance Co., supra; Williams v. Insurance Co., supra; Insurance Co. v. Insurance Co.*, 266 N.C. 430, 146 S.E. 2d 410 (1966); *Mills v. Insurance Co.*, 261 N.C. 546, 135 S.E. 2d 586 (1964); 13 Appleman, Insurance Law and Practice, § 7465 (rev. ed. 1976); 7 Blashfield Automobile Law and Practice, §§ 292.6, 292.7 (3d ed. 1966); 11 Couch on Insurance 2d, § 42:191 (1963).

As we said in *Insurance Co. v. Insurance Co., supra:*

"When an insurance company, in drafting its policy of insurance, uses a 'slippery' word to mark out and designate those who are insured by the policy, it is not the function of the court to sprinkle sand upon the ice by strict construction of the term. All who may, by any reasonable construction of the word, be included within the coverage afforded by the policy should be given its protection. If, in the application of this principle of construction, the limits of coverage slide across the slippery area and the company falls into a coverage somewhat more extensive than it comtemplated, the fault lies in its own selection of the words by which it chose to be bound.

"In the construction of contracts, even more than in the construction of statutes, words which are used in common, daily, nontechnical speech, should, in the absence of evidence of a contrary intent, be given the meaning which they have for laymen in such daily usage, rather than a restrictive meaning which they may have acquired in legal usage."

[3]   In the absence of a contrary provision therein, a policy of automobile insurance applies only to the vehicle specifically described therein as the insured vehicle. *Beck Motors, Inc. v. Federal Mutual Insurance Co.*, 443 S.W. 2d 200 (Mo. App., 1969); Annot., 127 A.L.R. 486 (1940). In the present case, had the policy contained no provision further extending its coverage, the only vehicle within the coverage of the policy would have been the 1973 Ford tractor owned by the plaintiff and the judgment of the trial court would have been correct. However, in order to make its policy more attractive to potential customers, the company extended the coverage of its policy to include, not only the designated vehicle owned by the insured, but also a vehicle not so designated if "such vehicle is *newly acquired* by the named insured during the policy period," and if "it *replaces* a described covered vehicle, *or* as of the date of its delivery *this insurance applies to all covered automobiles*," and if "the named insured notifies the company within 30 days following such delivery date." (Emphasis added.)

Thus, the policy provides that a "covered automobile" includes a "newly acquired" motor vehicle if "as of the date of its delivery this insurance applies to all *covered* automobiles." It is, obviously, not clear whether the date of delivery, contemplated in this provision of the policy, is the date of the delivery of the newly acquired vehicle or the date of the delivery of the policy. However, this term of the policy is even more obscure in its meaning than that. It states that the "newly acquired" vehicle is covered by the policy, even though it does not replace a described covered vehicle, if "this insurance applies to all covered automobiles." (Emphasis added.) The purpose of the company in inserting this alternative provision into the policy definition of a "covered automobile" is a baffling mystery for, obviously, the policy applies, at any given date, "to all covered automobiles."

We observe that the language in this policy varies, in several respects, including this alternative provision, from that used in the comparable provisions in policies of other companies which have come into courts for construction in cases hereinafter cited. It would seem plausible that the company here meant to say "owned automobiles," so as to extend the coverage to a "newly acquired automobile," provided, at the time the policy was issued, all vehicles *owned* by the named insured were insured by him

with this company. That is a provision frequently found in other such policies, but it is not what this policy says, and we cannot rewrite the policy by construction.

Certainly, we cannot construe this exceedingly ambiguous language in favor of the company. By hypothesis, this policy applied, both on the date the policy was delivered and also on the date the International tractor was leased, to "all covered automobiles," for a "covered automobile" is, necessarily, one to which the policy applies. Giving this provision its literal meaning, a "newly acquired" vehicle is a "covered automobile," even though it does not replace a "described covered vehicle."

Many of the policies involved in the cases hereinafter cited extended the coverage therein to a vehicle the "ownership" of which was "newly acquired." This policy does not so state. We are, therefore, not required in this case to determine whether the term "ownership," so used, would demand that the insured acquire the absolute ownership of, or the registered title to, the vehicle in order to bring it within the term "newly acquired," as used in this policy. The term here used is "newly acquired * * * during the policy period." The purpose of this provision is to limit the extension of the coverage to a vehicle acquired after the issuance of the policy. *Insurance Co. v. Shaffer, supra*; 7 Am. Jur. 2d, Automobile Insurance, § 101 (1963); Annot., 34 A.L.R. 2d 936, 940 (1954). Thus, it would not, in absence of the ambiguity above noted, apply to a retired vehicle still owned by the insured on the date the policy was issued and thereafter repaired by him and returned to service.

In the present case, if the International tractor was "acquired," within the meaning of this policy, it was "newly acquired." The complaint alleges that the International tractor was leased by the plaintiff from the owner thereof for a fixed period of 21 days, beginning after the issuance of the policy. By the express terms of the lease agreement, the plaintiff undertook to return this tractor to the lessor "in the same condition," ordinary wear and tear and certain specified risks excepted. The lease agreement did not authorize either party thereto to terminate it at will. Therefore, by this agreement, the plaintiff acquired the legal, non-terminable right to use the vehicle as if he were its absolute owner for the specified period. This cir-

Grant v. Insurance Co.

cumstance distinguishes the present case from a mere temporary, gratuitous loan of a vehicle terminable at the will of the lender, or a mere gratuitous, temporary exchange of vehicles belonging to the insured and a friend, which was the case in *Clarno v. Gamble-Robinson Co.*, 190 Minn. 256, 251 N.W. 268 (1933). It is a matter of common knowledge, of which we may take judicial notice, that today it is not unusual for motor vehicles to be leased for specified periods. If the defendant company did not intend its policy to cover such a leased vehicle, it could easily have so stated. In the silence of the policy upon this question, we conclude that the International tractor was an "acquired" motor vehicle within the meaning of this policy, and, consequently, a "newly acquired" one.

Assuming, for the sake of argument, that the above mentioned, ambiguous, alternative provision in paragraph (b)(i) of the definition of "covered automobile" is not sufficient to bring this "newly acquired vehicle" within the coverage of the policy, we turn to the question of whether the International tractor is covered because it *replaced* the described covered vehicle. In our opinion, the allegations of the complaint, which we must presently take to be true, are sufficient to bring it within the definition of "covered automobile" contained in the policy, for the reason that it did replace the described covered vehicle.

[4] Not infrequently, automobile insurance policies contain specific provisions with reference to the coverage of a "temporary substitute" for the described vehicle. *See, Quaderer v. Integrity Mutual Insurance Co.*, 263 Minn. 383, 116 N.W. 2d 605 (1962); Annot., 34 A.L.R. 2d 936, 947 (1954). The present policy does not and, so, it makes no distinction between a vehicle acquired as a permanent replacement and one acquired as a temporary replacement.

In *Continental Casualty Co. v. Employers Mutual Casualty Co.*, 198 Kan. 93, 422 P. 2d 560 (1967), the question was which company was the primary and which the excess carrier of liability insurance. Its determination depended upon whether a 1962 Cheverolet station wagon had "replaced" a 1958 Cadillac, described in the appellee's policy, or was an additional automobile, in which latter event the appellee had not been given the notice required in its policy. The court said:

"In the absence of evidence that the word 'replacement' had a meaning peculiar to the insurance field or that the parties intended any different meaning in the automobile liability policy, the usual and ordinary meaning of the term, that is, to provide a substitute or equivalent in place of a person or thing, would govern." 198 Kan. at 96, 422 P. 2d at 562.

The same statement appears in *Nationwide Mutual Insurance Co. v. Mast*, 52 Del. 127, 153 A. 2d 893 (1959), and in *Brescoll v. Nationwide Mutual Insurance Co.*, 116 Ohio App. 537, 189 N.E. 2d 173 (1961).

In an athletic contest, for example, in ordinary speech, a substitute, sent into the game, "replaces" the starting player, whether the change be intended to continue for the remainder of the contest or only for a brief period to enable the starter to rest. He is a replacement for the starter because the number of participants in the game remains the same and, while the substitute is on the field, the starter does not participate in the contest. Similarly, the International tractor replaced the Ford tractor in the plaintiff's business for the 21 day lease period.

If the defendant insurance company had intended to limit its extension of the "covered automobile" to a permanent replacement for the described vehicle, it could easily have so provided in its policy. Not having done so, the policyholder is entitled to give the word "replaces" its common and ordinary meaning, which the complaint alleges he did.

Quite obviously, the policy provision here in question was not intended by the parties to enable the policyholder to purchase collision coverage on a designated vehicle and, without payment of a further premium, to extend that coverage to a second vehicle acquired by him as an additional vehicle and used contemporaneously with the designated vehicle. There is, however, in this respect, a clear distinction between an additional vehicle and a substitute vehicle which "replaces," even though temporarily, the vehicle designated in the policy.

Not infrequently, policies, containing a provision extending coverage to a newly acquired vehicle which replaces the designated vehicle, provide that the insurance upon the designated vehicle terminates when it is replaced. *See, Dean v.*

*Niagra Fire Insurance Co.*, 24 Cal. App. 2d Supp. 762, 68 P. 2d 1021 (1937); *McKinney v. Calvert Fire Ins. Co.*, 274 S.W. 2d 891 (Tex. Civ. App., 1955). No such provision appears in the policy before us. It is, to be sure, conceivable that, while the designated vehicle is temporarily in a garage for repairs and the owner has substituted for it a leased vehicle, the designated vehicle may be damaged by someone's driving another vehicle into collision with it, but such risk is minimal, as compared with the risk of a collision to a vehicle in operation on the highway, the risk for which the company has been compensated by the premium paid, and from which, for all practical purposes, it is temporarily relieved. The company, in writing its policy form, can easily protect itself against this minimal double coverage, restoring coverage to the original, designated vehicle when it, repaired, replaces the leased vehicle. Here, the company did not attempt to do so. To construe its word, "replaces," as intended to give the company that protection is not consistent with the above mentioned rule that ambiguous terms must be construed in favor of the policyholder.

We think that the decision of this case is controlled by the principle announced by this Court in *Insurance Co. v. Shaffer*, 250 N.C. 45, 108 S.E. 2d 49 (1959). There, the question for determination was which of two liability insurance companies provided coverage with respect to an accident involving a 1954 Ford registered in the name of Shaffer. The policy issued by State Farm Mutual covered a 1950 Ford. At the time of the accident, that vehicle was at Shaffer's home, in operable condition, registered in his name and under his control. Shaffer also obtained a Nationwide Insurance Company policy on a different 1950 Ford. That vehicle, called the Nationwide Ford, was used as a trade-in on the purchase of the 1954 Ford, which was involved in the accident. Each policy provided coverage for a "newly acquired automobile," which "replaces" an automobile owned by the insured and described in the policy. Neither company was notified of the transaction by which the Nationwide Ford was traded in on the purchase of the 1954 Ford. In holding that the 1954 Ford "replaced" the Nationwide Ford, so as to impose liability upon the Nationwide company, and did not "replace" the State Farm Ford, so as to impose liability upon the State Farm company, this Court, speaking through Justice Clifton Moore, said:

"It is our opinion that the replacement vehicle is one the ownership of which has been acquired after the issuance of the policy and during the policy period, and it must replace the car described in the policy, which must be disposed of *or be incapable of further service at the time of replacement.* * * * On 11 August, 1957, date of the accident, the State Farm Ford was still owned by Shaffer and under his control, *in operating condition* and being driven by him and his son. It was then covered by the State Farm policy. Therefore, the 1954 Ford could not replace the State Farm Ford since Shaffer still retained the State Farm Ford *in operable condition.*" (Emphasis added.) 250 N.C. at 52, 108 S.E. 2d at 54.

[5] Our decision in the *Shaffer* case has been frequently cited, by the courts of other states, as establishing the proposition that a "newly acquired" automobile does not "replace" the vehicle designated in the policy if the designated automobile continues to be owned by the policyholder, under his control and *in operable condition. Fleming v. Nationwide Mutual Insurance Co.,* 383 F. 2d 145 (4th Cir., 1967); *Yenowine v. State Farm Mutual Automobile Insurance Co.,* 342 F. 2d 957 (6th Cir., 1965); *Mitcham v. Travelers Indemnity Co.,* 127 F. 2d 27 (4th Cir., 1942); *Quaderer v. Integrity Mutual Insurance Co., supra; Beck Motors, Inc. v. Federal Mutual Insurance Co., supra; McKinney v. Calvert Fire Insurance Co., supra; National Indemnity Co. v. Giampapa,* 65 Wash. 2d 627, 399 P. 2d 81 (1965).

In the Beck Motors case, *supra,* the plaintiff insured was an automobile dealer. It was his custom to furnish, from his used car stock, a car for use of his sales manager, replacing it with another car, from time to time, as the various vehicles were sold, and, as each such successive replacement occurred, making an appropriate change in the policy of insurance as to the vehicle covered. He had a similar agreement with his accountant. An opportunity arose to sell the car being used by the accountant, so the plaintiff picked up that car and left in its place a 1967 Plymouth which the sales manager had previously been driving, thus leaving the sales manager with no car furnished by the plaintiff. Some time thereafter, the plaintiff acquired in trade a 1966 Dodge which he immediately turned over to the sales manager for the latter's use, but there was no change in the insurance policy

so as to designate this as an insured car. On his way home that day, the sales manager had a wreck in the Dodge and was killed. At that time, the plaintiff owned approximately 200 to 250 automobiles, his stock in trade, but did not have a fleet insurance policy. The question was whether the Dodge so driven by the sales manager at the time of the accident replaced the Plymouth which was designated in the policy and which had been so taken from the sales manager and turned over to the accountant. Applying the rule laid down in our *Shaffer* decision, *supra*, the *Court* held the Dodge did not replace the Plymouth, the Plymouth being still owned by the plaintiff, still in operable condition and still actually in operation by the accountant. Furthermore, as the Missouri Court stated, the Dodge was not acquired by the plaintiff for the purpose of replacing the Plymouth but was acquired by him in his regular course of business as an automobile dealer. That decision is consistent with the one which we reach here.

In *Mitcham v. Travelers Indemnity Co., supra*, the car described in the policy was a Buick owned by the insured. He then purchased a Lincoln which he was driving at the time of the accident. On the same day that he acquired the Lincoln, the insured delivered his Buick automobile to a motor company to be sold for him and requested the motor company to obtain insurance on the Buick to protect it against fire and theft, which insurance was taken in another company. The Buick was not traded in upon the purchase price of the Lincoln. The insured retained title to the Buick. No purchaser for the Buick was found and no one used it prior to the death of the insured in the accident, which occurred some 12 days after the purchase of the Lincoln. The Court of Appeals for the Fourth Circuit held the Lincoln did not, in fact, replace the Buick, since the insured still retained title to the Buick and full control over it and "at any time he could have taken it from the custody of the motor company and put it into use." Thus, at the time of the accident, the Buick, which was designated in the policy as the insured car, was still owned by the insured, was in an operable condition and was subject to his operation at will. This decision is also completely consistent with the one we here reach. In our opinion, the other cases above cited, denying coverage, are likewise consistent with our present decision.

In *Merchants Mutual Casualty Co. v. Lambert*, 90 N.H. 507, 11 A. 2d 361, 127 A.L.R. 483 (1940), the policy described a 1930 Pierce-Arrow as the insured vehicle. It provided coverage for a subsequently acquired vehicle "if it replaces an automobile described in this policy." From October to December 1, 1938, the described vehicle was not used by the insured in his business because it was "worn out, out of repair and not fit to be driven on the public highway." On December 1, 1938, the insured bought a 1935 Pierce-Arrow for the same use previously made of the vehicle described in the policy. On the day he purchased it, this car was involved in an accident. At the time of the accident, the insured still owned the 1930 Pierce-Arrow described in the policy, which was in his garage with valid license plates attached and registered in his name at the Motor Vehicle Department. The New Hampshire Court held the subsequently purchased Pierce-Arrow replaced the one described in the policy and so was covered thereby, saying:

"We think it plain that any reasonable person in the position of the defendant Lambert [the insured] would have understood from the language set forth in the statement of facts, that when he purchased another automobile to replace the 1930 Pierce-Arrow, his insurance would automatically apply to the replacing automobile 'as of the date of its delivery to him.' The plaintiff, if it had seen fit, might have inserted a provision that the insurance should not attach to the replacing car until the insured had parted with the ownership and possession of the replaced car, but in the absence of any such provision in the policy, these factors of the situation were properly regarded by the trial court as indecisive." 90 N.H. at 510, 11 A. 2d at 362-363.

In accord with the holding of the *Lambert* case, *supra*, that to "replace" a vehicle described in the policy, it is not required that the insured dispose of that vehicle if it is not operable, are the following: *Hoffman v. Illinois National Casualty Co.*, 159 F. 2d 564 (7th Cir., 1947); *Maryland Indemnity & Fire Insurance Exchange v. Steers*, 221 Md. 380, 157 A. 2d 803 (1960); *Brescoll v. Nationwide Mutual Insurance Co.*, *supra*; *Royer v. Shawnee Mutual Insurance Co.*, 91 Ohio App. 356, 106 N.E. 2d 784 (1950); *Filaseta v. Pennsylvania Threshermen & Farmers' Mutual Casualty In-*

*surance Co.*, 209 Pa. Super. 322, 228 A. 2d 18 (1967); 11 Couch on Insurance 2d, § 42:201 (1963); Annot., 34 A.L.R. 2d 936, 945 (1954).

In the *Hoffman* case, *supra*, the vehicle described in the policy was a Ford tractor which was used by the plaintiff in his business of making daily trips to carry livestock to Chicago. This vehicle was involved in an accident. It was not completely wrecked, but was not thereafter used or operated by him. He filed a claim for the loss of this vehicle under his policy, but did not notify the company that he was purchasing a new vehicle. While that claim was pending, he purchased another Ford tractor and used it in his same business. One week later, the second tractor, while being so operated, was involved in the accident in question. The Court of Appeals for the Seventh Circuit said:

> "[I]t is clear that when the first tractor was wrecked and the second tractor was acquired and used in its place, a reasonable person in such a situation, from the language used, would have reasonably assumed that all coverage with respect to the first tractor was terminated and that the policy, without notice, was automatically transferred as of the date of the delivery of the second tractor for a period of 30 days [the time allowed in the policy for giving notice] to the newly acquired tractor." 159 F. 2d at 566.

In the *Filaseta* case, *supra*, the vehicle described in the policy was a 1949 Studebaker truck, used by the insured, a masonry contractor, for the purpose of hauling materials. While being so used, it broke down and had to be towed to a garage. The insured then *borrowed* (emphasis added) a 1953 Chevrolet truck in order to continue his business. This was used for the same purpose for which the Studebaker was used. Thereafter, the insured bought the previously borrowed Chevrolet truck and, three days later, it was involved in an accident. At the time of the second accident, the Studebaker truck was still undergoing repairs. After the completion of the repairs, the Studebaker truck was driven to a service station where it was advertised for sale and was sold some two months later. The court held the Chevrolet truck replaced the Studebaker within the meaning of the policy, saying:

> "In this case there was no factual risk of the insurance company covering two trucks at the same time as the listed vehicle was inoperative, or had been placed upon a lot for

resale where it was not subject to the risks run by the replacement vehicle. In such cases the courts have found in favor of the insured. Most certainly, a hard and fast rule that the car must be junked or sold before the replacement clause can go into effect would work in many cases a substantial injustice." 209 Pa. Super. at 328, 228 A. 2d at 22.

In the *Brescoll* case, *supra*, the designated automobile was a Ford. It was involved in a collision and was thereafter operable only in second and third gears but was continued in service for some months. It was then taken to a garage where repairs were undertaken in order to put it in condition for sale. The repairs were continued over a period of about one month, during which the Ford was entirely out of service. The insured, meanwhile, purchased a Lincoln with the intention of selling the Ford when the repairs were completed. When the repairs of the Ford were completed, it was delivered to the custody of the plaintiff in operable condition and was placed by the plaintiff on a car lot for sale. Efforts to sell it were not successful so the plaintiff removed it to her residence and there continued to advertise it for sale, using the Lincoln meanwhile. The Ford was used only to transport it to and from the place of repair or in demonstrations to prospective customers. The court held the Lincoln had replaced the Ford in "the ordinary meaning of the term," that is, a substitute or equivalent, saying:

> "In the instant case, the Ford car was out of service from September 18th to the time of completion of its repair in the latter part of October. After its repair, the Ford was used only for transportation incident to its sale. From the date of its purchase, the Lincoln, instead of the Ford, was regularly and continuously used by the insured. In our opinion, to all intents and purposes, the Lincoln thus replaced the Ford." 116 Ohio App. at 542, 189 N.E. 2d at 176.

[6] The present case is substantially stronger for the insured than the *Brescoll* case, *supra*, for here, interpreting the complaint favorably for the plaintiff, as is proper upon the motion to dismiss, it would appear that at all times from the acquisition, by lease, of the International tractor, the Ford tractor, designated in the policy, was undergoing repairs and was not in an operable condition. Thus, we hold that, as of the time of the accident, the

Ford tractor had been replaced by the International tractor so that the policy covered the International tractor.

We are not required in this case to determine whether, during the period that the International tractor was so covered as a replacement vehicle, the defendant company would have been liable had the Ford tractor been struck while within the repair garage.

We think it clear that had the insured notified the company when he acquired the International tractor by lease that it was a replacement for the Ford, it would be so deemed within the meaning of this policy for that would have shown his intent so to replace the Ford. But, the policy did not require such notice until 30 days after the acquisition and the complaint clearly alleges his intent to bring the International tractor under the coverage of the policy. The provision in the policy that the "newly acquired" vehicle is a "covered vehicle," if the named insured notifies the company within 30 days, clearly sets up a condition subsequent, not a condition precedent, to the coverage of the "newly acquired" vehicle. Obviously, the company intended to insure the "newly acquired" vehicle during the grace period allowed for the giving of the notice. *See:* Annot., 34 A.L.R. 2d 936, 944 (1954).

We observe no basis for a distinction in this respect between liability insurance and collision insurance, suggested by the defendant in oral argument. It is true that the public has an interest in the maintenance of liability insurance as is evidenced by the enactment of our Financial Responsibility Law. For that reason, ambiguous provisions in liability insurance policies are construed against the insurer. However, for the reasons above set forth, ambiguous provisions in collision insurance policies are also construed against the insurer. Furthermore, we may take judicial notice of the well known fact that it is customary, though not universal, for collision coverage and liability coverage to be provided in the same insurance policy. It would be most confusing, and contrary to the probable intent of the parties, if the term "replace," with reference to a "newly acquired" vehicle, were to be given different meanings with reference to the different coverages in the same policy, in the absence of a clear expression therein of such intent.

We, therefore, conclude that it was error to allow the motion to dismiss the plaintiff's complaint on the theory that it fails to state a cause of action. In our opinion, the plaintiff has stated a cause of action, somewhat meagerly, but sufficiently under the present concept of "notice pleading." Whether he can, at trial, establish the facts alleged in the complaint, as elaborated by the documents thereto attached, is a matter not presently before us.

Reversed.